## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| MICHELLE BAPTIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-cv-3168 |
| | ) | |
| KILOLO KIJAKAZI, Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## <u>REPORT AND RECOMMENDATION</u>

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Michelle Baptist appeals from the denial of her application for Social Security Disability Insurance under Title II of the Social Security Act and her application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act (collectively Disability Benefits).  42 U.S.C. §§ 416(i), 423, 1381a and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Baptist filed Plaintiff's Motion for Summary Judgment (d/e 15).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 19).  Baptist filed her Plaintiff's Reply Brief (d/e

---

[1] This Court takes judicial notice that Kilolo Kijakazi has been appointed Acting Commissioner of Social Security.  As such, she is automatically substituted in as the Defendant in this case.  Fed. R. Civ. P. 25(d).

21).  This matter is before this Court for a Report and Recommendation.
For the reasons set forth below, this Court recommends that the Decision
of the Commissioner should be affirmed.

## BACKGROUND

Baptist was born on April 29, 1963 and she completed high school.
She applied for Disability Benefits in August 2014.  Baptist suffered a
whiplash injury in an automobile accident on December 12, 2013.  She
alleged that she became disabled on December 14, 2013 (Onset Date).
She suffered from cervical radiculopathy and two cerebral aneurysms,
status post-surgical clipping of one of the aneurysms.  Baptist previously
worked as a personal assistant, store clerk, and a bartender.  Baptist
continued to work as a personal assistant for her adult disabled son after
the Onset Date.  She earned enough as his personal assistant during the
first three quarters of 2015 to constitute engaging in substantial gainful
activity.  The rest of the time since the Onset Date, she did not earn
enough to constitute substantial gainful activity.  Certified Transcript of
Proceedings before the Social Security Administration (d/e 10) (R.), at 26-
28, 73, 80, 222, 335.

## STATEMENT OF FACTS

### Evidence Submitted Prior to the Evidentiary Hearing

On December 13, 2013, Baptist saw physician's assistant Erin Kirkpatrick, PA-C. Baptist reported that she was in an automobile accident the day before and she had stiffness in her neck and shoulders and a headache. R.1101. Baptist rated the pain as moderate and stated she did not have any dizziness, nausea, or vomiting. On examination, Baptist's neck was tender; her back and extremities had normal range of motion; her neurological examination was normal. Baptist was cooperative and had a normal mood and affect. X-rays of her cervical spine showed mild degenerative changes from C5-C7. R. 1102-03, 1106. Kirkpatrick diagnosed neck strain and cervical pain, administered a Toradol injection, and prescribed cyclobenzaprine. Kirkpatrick limited Baptist to a lifting limit of 8 pounds or a gallon of milk for one to two weeks. She also told Baptist that she could take over-the-counter anti-inflammatory medications and to apply heat for 20 minutes every one to two hours. R. 1104.

On February 6, 2014, Baptist saw physical therapist Jason Beeler, PT, for an initial evaluation. She reported constant pain at the base of the skull, with the right side worse than the left. She rated the pain at 7/10 and said her head felt better with support and that pain medication and heat

helped with the pain.  She also had frequent headaches in the evening.  R. 1203.  On examination, Baptist had tenderness on palpation to the bilateral upper trapezius, scalene, and rhomboid muscles; her range of motion was within normal limits with some discomfort in her shoulders on some movements; her strength was 5/5 except for her shoulders.  The shoulder testing was not reliable due to pain but showed >3+/5 strength.  Repeated cervical flexion produced increased pain and dizziness.  The repeated movement test showed possible posterior derangement of the cervical spine.  She had moderate strain of the cervical musculature.  R. 1204. From February 6 to March 20, 2014, Baptist had several physical therapy sessions.  R. 1196-1219.  On March 19, 2014, Baptist reported that her symptoms were unchanged.  Physical therapist Beeler referred Baptist back to her doctor.  R. 1197.

On March 31, 2014, Baptist saw her primary care physician Dr. John Lee, M.D.  She reported constant neck pain and rated the pain at 5/10.  Her symptoms improved with rest and holding her neck still and got worse when moving her neck.  Baptist also reported neck stiffness, crepitus, tenderness, impaired range of motion of her neck, and shoulder pain.  R. 1116.  On examination, movement of her cervical spine in all directions was painful and restricted.  Dr. Lee assessed neck pain and prescribed

hydrocodone-acetaminophen 5/325 mg, once every six hours.  He ordered an MRI of her cervical spine.  R. 1117.

On April 10, 2014, Baptist had an MRI of her cervical spine which showed disc narrowing at C6-7 and C6-T1; minor annular bulging at C5-6, C6-7, C7-T1, and T2-3 without: (1) focal disc herniation, (2) central canal stenosis, or (3) visible neural impingement; loss of normal lordosis; and incidental T2 vertebral hemangioma.  R. R. 1170.

On June 19, 2014, Baptist saw Dr. Lee.  She reported no change in her condition and that she was taking her medications and denied any side effects.  She rated her pain at 8/10.  R. 1113.  On examination of her cervical spine, she had tenderness at level 2-4, and movement of her neck in all directions was painful and restricted.  Dr. Lee ordered a urine tox screen.  R. 1114.

On August 1, 2014, Baptist saw pain specialist Dr. Koteswara Narla, M.D. for pain management.  Baptist's urine tox screen came back positive for marijuana.  Dr. Narla and Lee agreed that she should not use marijuana and other pain medications together.  Dr. Narla said that the MRI showed a tiny disc protrusion at C6-7 and C7-T1 and no significant compression of the nerve roots.  Baptist reported no balance problems.  She had tingling in her hands, more on the right than left, and rated her pain at 8-9/10.  The

pain was continuous and interfered with sleep, physical activity, and emotions.  Physical therapy did not help.  R. 1139.  Baptist's neurological examination was normal, her sensation was normal, and her coordination was normal.  She could also walk on her heels, toes, and tandem.  Her cervical range of motion was painful and limited in all directions.  R. 1140.  Dr. Narla said she could prescribe a steroid injection, but she was not sure the injection would make any difference because Baptist's MRI showed only a small disc protrusion.  She would not prescribe narcotic medication because Baptist was using marijuana.  Baptist declined the injection.  Dr. Narla recommended continuing an exercise program and said she had nothing else to offer Baptist.  R. 1140-41.

On August 21, 2014, Baptist went to the emergency room.  She had started taking trazadone three days earlier to help her sleep and she reported headaches and night terrors in her sleep for two nights.  The first night the headache was moderate and the second night she had the "worst headache ever."  She did not take Trazadone on the third night.  Her examination was normal.  R. 1153.  A chest x-ray was normal.  R. 1155-56.  A head CT showed a possible small aneurysm and she was scheduled for magnetic resonance angiography (MRA) to confirm the existence of an aneurysm.  R. 1157.

On August 22, 2014, an MRA of Baptist's brain confirmed the existence of an aneurysm in the anterior communicating artery and a probable second smaller aneurysm in the right middle cerebral artery. R. 1168.

On September 5, 2014, Baptist saw neurologist Dr. Sushant Punjaram Kale, M.D. She reported getting headaches every day. Dr. Kale stated that Baptist's aneurysms probably did not relate to her headaches and recommended that she quit smoking. Dr. Kale recommended conservative treatment for her aneurysms and limited Baptist to lifting no more than 20 pounds. R. 1171.

On September 8, 2014, Baptist saw Dr. Joshua Ellison, M.D., to establish care as her primary care physician. She reported chronic neck, shoulder, back pain, and headaches. She had trouble sleeping and reported range of motion problems in her shoulders and neck. R. 1236. On examination, Baptist had an abnormal appearance; she sat very still; she had normal gait and station; she had pain in the lateral trapezius muscles extending down to the mid back in the trapezius and paraspinal muscles. Dr. Ellison did not test muscle strength due to pain. Dr. Ellison stopped the trazodone and prescribed amitriptyline at bedtime. R. 1237. He noted, "I think she had a chronically sprained trap, and with enough

time, I'm hoping this will resolve.  I personally don't think her current complaints are coming from the nerves in her neck based on the MRI result."  R. 1238.

On October 20, 2014, Baptist saw physical therapist Beeler for an initial evaluation.  R. 1181-83.  She reported pain at the base of her skull, right side worse than the left, and rated the pain at 8/10.  She woke up every morning with a headache.  On examination, Baptist had myotension and tenderness over the upper trapezius, scalene, and rhomboid muscles; her range of motion was within normal limits; she had discomfort in the end of the range of motions in her shoulders; her wrists and elbows had 5/5 strength; shoulder strength testing was not accurate due to pain, but Baptist showed >3+/5 strength; she had reduced range of motion in her cervical spine.  Beeler scheduled one to two therapy sessions a week for two weeks.  R. 1182.  Baptist completed her therapy sessions on November 12, 2014.  She reported no improvement in her condition.  She reported daily headaches and she now experienced numbness in her right hand.  R. 1259.  She was discharged from therapy and told to continue her home exercise program.  R. 1260.

On December 4, 2014, Baptist saw Dr. Ellison.  She reported numbness in both hands which was getting worse.  She also had an aching

neck and back.  On examination, Baptist sat stiffly and appeared to be in pain; her gait and station were normal; her joints, bones, and muscles were normal; her range of motion was normal; she had weakness in her grip, more so on the right; she had pain to palpation over the trapezius down into paraspinal muscles.  Dr. Ellison changed her medications and ordered an electromyography (EMG).  R. 1257-58.

On December 9, 2014, physiatrist Dr. Edward Trudeau, M.D., performed an EMG.  Dr. Trudeau's physical examination showed tenderness to palpation in the cervical region; in the shoulder girdle, right more than left; and up and down the thoracic and lumbar spine.  She showed weakness in the right triceps, wrist, and finger extensors.  R. 1267. The EMG showed mild right C7 radiculopathy.  Dr. Trudeau found no evidence of cervical radiculopathy, median neuropathy, entrapment neuropathy, brachial plexopathy, or mononeuritis multiplex.  R. 1272.

On January 21, 2015, Baptist saw state agency physician Dr. Vittal Chapa, M.D., for a consultative examination.  She reported upper back and neck pain and said she woke up each day with a headache.  She reported numbness in her right hand.  On examination, Baptist was in no acute distress; she had a normal gait; she was oriented and in good contact with reality; she had no edema, joint redness, or heat; her grip strength was 5/5

bilaterally.  She could perform fine and gross manipulations with both hands and her lumbosacral spine flexion was normal.  Straight leg testing was negative and she had full range of motion in all joints "except subjectively she had limited range of motion of the cervical spine."  She had no muscle atrophy.  Tinel's sign was negative for both wrists.[2]  Her upper extremity strength was 5/5.  Her sensory exam was within normal limits.  Her neurological exam was "essentially within normal limits."  R. 1274-76.

On February 3, 2015, state agency physician Dr. B. Rock Oh, M.D., prepared a Physical Residual Functional Capacity Assessment.  Dr. Oh opined that Baptist could lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk for more than six hours in an eight-hour workday; and sit for more than six hours in an eight-hour workday.  Dr. Oh found no other functional limitations due to her physical impairments.   R. 177-78.

On February 13, 2015, Baptist saw Dr. Ellison.  She reported having a terrible amount of pain and that she woke up with numbness in the middle of the night.  She reported tightness in her right fingers, pain in her left forearm, and "unbearable" pain in her hand.  R. 1296. On examination,

---

[2] A positive Tinel's sign is an indication of carpal tunnel syndrome.  See Dorland's Illustrated Medical Dictionary (32nd ed. 2013) (Dorland's), at 1716.

Baptist appeared stiff and in pain; her gait and station were normal; her bones, muscles, and joints were normal; her range of motion was normal; she had weakened grip strength, weaker on the right. She had pain to palpation over the right trapezius and down into the paraspinal muscles. Dr. Ellison concluded,

> Chronic neck pain and tingling. It would appear this is muscular or neurological but nothing on objective exams are really found to support it but that doesn't change the fact that she has pain. We will have her increase Lyrica today, stop atorvastatin for the next month, continue others as prescribed and follow up in a month.

R. 1286, 1298.

On March 12, 2015, Dr. Ellison completed a Medical Opinion Re-Ability to do Work-Related Activities form. R. 1285. Dr. Ellison opined that Baptist was not capable of performing a full-time job on a regular and continuing basis. His diagnosis was chronic neck and back pain and he stated an MRI showed a disc protrusion and clinical examinations showed less strength throughout. Dr. Ellison opined that Baptist could stand and walk for less than two hours in an eight-hour workday; sit for less than two hours in an eight-hour workday; and occasionally and frequently lift less than 10 pounds. Baptist would need the ability to change positions between sitting, standing, and walking during an eight-hour workday, and she would need to lie down at unpredictable times during an eight-hour

workday.  She would be absent from work more than three times a month, and she may be limited cognitively by her pain medications.   R. 1285.

On March 20, 2015, Baptist saw Dr. Ellison.  She reported excruciating pain that woke her up at night.  R. 1290.  On examination, Baptist had tightness in the musculature of her neck and back with pain to even light palpation; her range of motion was limited in her shoulders; she had decreased strength throughout.  R. 1291.  Dr. Ellison increased the dosage of her Lyrica.  R. 1292.

On April 14, 2015, Baptist completed a Function Report—Adult Form. R. 781-89.  Baptist's daughter Gabrielle Baptist helped fill out the form because of pain and numbness in Baptist's right hand.  R. 788.  Baptist lived at home with her family and said that since her December 2013 automobile accident she had chronic pain in her neck, shoulders, and back, as well as numbness in her hands and headaches.  She had a weightlifting restriction of 10 pounds and the pain affected her sleep.  R. 781.  In a typical day, Baptist got up at 6:00 a.m. She prayed and then woke her children got them ready for work and school.  She rested until her family returned home.  She also took care of her disabled son with daily living skills and took care of her teenaged son.  R. 781-82.

Baptist had pain dressing herself and performing her personal care. She could not use a hair dryer due to the pain in her neck and shoulders. She prepared daily meals - "snack size meals" for herself and dinner for her family.  The snack size meals took five minutes each, and the dinner took an hour.  She did light cleaning at home a couple of times a week for about 20 minutes each time.  R. 783.

Baptist drove her children to work and school each day and went shopping two to three times a week.  A shopping trip took 30 minutes to one and a half hours.  She could pay bills, count change, and handle a check book.  She sometimes needed assistance with checks due to numbness and pain.  R. 784.  Baptist had no hobbies due to her pain.  She read when necessary and talked to family on the phone three times a week.  She did not go anywhere on a regular basis. She got along well with authority figures, and she did not have problems with changes in routine. She was worried about the aneurysms and worried about her pain.  She did not engage in social activities because she was afraid the pain would get worse.  R. 785-87.

Baptist said that her physical impairments limited her ability to lift, squat, bend, stand, reach, walk, sit, climb stairs, complete tasks, concentrate, and use her hands.  She had a weightlifting restriction of 10

pounds and physical movements caused pain and numbness.  She estimated she could walk 20 feet and needed to rest for 15 minutes.  She could pay attention for 10 minutes.  She could follow three to four step written instructions "due to intensifying headaches, try not to add stress or pressure to head due to aneurysm."  Her ability to follow spoken instructions depended on her pain level.  R. 787.  Baptist said her medications caused constipation, drowsiness, gas, blurred vision, fatigue, weakness, and weight gain.  R. 788.

On April 20, 2015, Baptist saw nurse practitioner Rebecca Wangard, FNP-BC, in Dr. Ellison's office.  Baptist reported that the numbness was getting better, but she was still waking up at night due to headaches and hand numbness.  R. 1910.  On examination, Baptist had normal gait and station, and her mood and affect were normal.  R. 1911.

On July 17, 2015, state agency physician Dr. James Williams, M.D., prepared a Physical Residual Functional Capacity Assessment for Baptist.  Dr. Williams opined that Baptist could lift 20 pounds occasionally, lift 10 pounds frequently, stand and/or walk for more than six hours in an eight-hour workday, and sit for more than six hours in an eight-hour workday.  Dr. Williams found no other functional limitations due to Baptist's physical impairments.  R. 201-02.

On September 4, 2015, Baptist saw neurosurgeon Dr. Devin Vikram Amin, M.D., regarding possible surgery on her aneurysms. On examination, Baptist was alert and oriented; she had upper extremity strength of 5/5; her tandem gait was normal. R. 1808. She had no back pain, muscle aches, or weakness, but she had neck stiffness and pain. She was positive for headaches and head injury. R. 1810. Dr. Amin discussed the risks of possible rupture of the aneurysm and the risks of surgery. Dr. Amin told Baptist she would have a 10 percent chance of complications from an operative aneurysm clipping. R. 1808-09.

On October 2, 2015, Baptist saw Dr. Ellison for him to fill out disability paperwork. Baptist said she spent 80 percent of her time in bed. She got her children off to school, did a few chores, and went back to bed. She said she got her disabled son up at 8:30 a.m. and watched him all day. She could not lift much, and she had to lie down frequently. She reported headaches all the time and that she did not sleep well but slept "a lot." She said she was not fatigued before the accident. R. 1789. On examination, Baptist sat stiffly; she had pain in her upper extremities but not swelling; she had normal range of motion; her muscle strength was "very weak throughout, though lack of effort." R. 1791.

Dr. Ellison commented on completing Baptist's disability paperwork,

She has chronic neck pain, and I will fill in the paperwork for SSI that she asked me to complete. However, I can only fill in subjective things. I'm not quite sure what is going on with Michelle. Thre (sic) is no objective evidence still of something wrong with her. She continues to complain of pain and fatigue and inability to do anything. When testing strength, it is obvious to me she is not trying as much. She squeezed my fingers so lightly on testing strength, but then with shaking hands goodbye it is much stronger. She will not kick her legs out to test leg extension because she says she is weak, though she walks fine and is not falling. I think if she had this kind of weakness, she would have other issues occurring, like falls. We may need to send her for specialty evaluation for further workup. I don't know if this is more likely to be somatoform disorder, or whether this is malingering. She may truly have chronic neck pain and fatigue though. We will send in medicine for quitting smoking also, discussed with her, she is amenable.

R. 1791.

On November 3, 2015, Baptist saw rheumatologist Dr. Sriya Ranatunga, M.D.  R. 1344-46.  Baptist reported bilateral hand numbness that worsened with activity such as writing.  The numbness and weakness were constant and she reported pain that shot from her neck down to her fingertips.  She also reported headaches at the base of the skull and in the neck.  R. 1344.  On examination, Baptist was in no acute distress; she had normal gait and station; her joints, bones, and muscles were normal; her range of motion was within normal limits; her biceps, triceps, and deltoids had 4/5 strength; she had symmetric reflexes and a normal sensory exam.

Baptist could not form a fist during grip testing, but she could form a fist during range of motion testing.  Dr. Ranatunga assessed neck pain and recommended repeating the EMG and MRI to see if her problems had progressed.  If she had no change, Dr. Ranatunga recommended physical therapy.  Dr. Ranatunga said Baptist had no inflammatory arthropathy.  R. 1346.

On November 4, 2015, Dr. Ellison completed a Medical Source Statement for Baptist.  Dr. Ellison had seen Baptist once every two months for a year.  Dr. Ellison said Baptist had neck and limb pain, headaches, neck pain, insomnia due to the pain, and fatigue.  She winced on palpation of the affected areas.  Dr. Ellison stated that Baptist's pain medication could cause drowsiness and he did not know if Baptist was a malingerer.  He opined that emotional factors probably contributed to the severity of her symptoms and stated that she might have a somatoform disorder.  R. 1337.  Dr. Ellison stated that Baptist's physical and mental impairments were not reasonably consistent with the symptoms and functional limitations that he described in this Medical Source Statement.  Dr. Ellison explained, "Her severity of pain and disability do not follow her exam findings and I think she exaggerates her exam."  R. 1338.  He opined that Baptist's symptoms would constantly interfere with attention and concentration needed to

perform simple work tasks.  She was capable of performing high stress work.  She could walk one half of a block, sit for 10 minutes at a time, and stand for 10 minutes at a time.  She could stand and/or walk for two hours in an eight-hour workday, and she could sit for at least six hours in an eight-hour workday.  During an eight-hour workday, she would need to walk around every 15 minutes.  Each time she would need to walk for five minutes.  She needed unscheduled breaks every 15 to 30 minutes in an eight-hour workday.  Each break would last 10 to 15 minutes.  She could rarely lift less than 10 pounds and never 10 pounds or more.  R. 1339.  She could frequently hold her head still and rarely move it in any direction.  She could never climb ladders and rarely twist, stoop, crouch, squat, or climb stairs.  She could use her right hand 10 percent of the time to engage in gross manipulations and 10 percent of the time to perform fine manipulations.  She could not reach with her right arm.  She had no limitations in the use of her left arm and hand.  She would be absent from work more than four days per month.  R. 1340.

On January 4, 2016, Baptist had an intracranial CT angiogram and an MRI of the brain which showed the two aneurysms previously found.  The MRI also showed no acute intracranial process, mild volume loss, and mild chronic small vessel ischemic disease.  R. 1692-93.

On January 20, 2016, Dr. Amin performed surgery to clip the larger aneurysm and wrap the smaller aneurysm.  R. 1529.  Baptist was told that after four weeks, she could resume normal activities but no extraordinary activities, and that she had no restrictions on her activities after six weeks.  R. 1375.

On January 23, 2016, Baptist saw occupational therapist Kylie Sheedy, OT, for therapy for performing activities of daily living and mobility after the surgery.  Sheedy recommended discharge to home with 24-hour assistance.  Baptist needed "maximal encouragement" to participate in therapy.  Baptist reported that she had constant headaches and rated her pain at 9/10.  R. 1608-09.

On January 25, 2016, Baptist went to the emergency room because of headache and swelling and pain to her right eye.  R. 1653, 1655.  She rated her pain at 8/10.  R. 1654.  She reported headaches, dizziness, and light sensitivity.  R. 1657.  A CT scan showed post-operative changes, a stable leftward midline shift of 3 mm, and a developing infarct in the medial right temporal lobe.[3]  R. 1665.  She was discharged when her condition was stable.  R. 1657.

---

[3] An infarct is an area of coagulation necrosis caused by an obstruction of circulation to the affected area. See Dorland's, at 934.

On February 11, 2016, Baptist went to the emergency room. She reported that a week earlier, she suddenly lost strength in her left leg and fell. She also began experiencing blurry vision in her right eye. Two days earlier she dropped her phone when her left arm suddenly became numb and weak. She also felt weakness and numbness in her left leg and had blurry vision in her right eye. Dr. Fazeel Siddiqui, M.D., admitted her for 23-hour observation. Baptist also saw a resident Dr. Breck Jones, M.D. A brain MRI showed a subacute infarct in the right anterior temporal lobe and several small lacunar infarcts in the right frontal lobe, and the small aneurysm had redemonstrated. R. 1466. Dr. Siddiqui concluded that Baptist did not have an acute stroke but may have had retractor injuries from the aneurysm surgery. Dr. Siddiqui said the right aneurysm that was clipped in surgery remained unchanged and Baptist was at her baseline. R. 1848.

On February 17, 2016, Baptist saw Dr. Ellison. She reported that she was getting a little better and was concerned that she might have depression. R. 1783. Baptist's examination was normal except that she sat very stiffly. R. 1784. Dr. Ellison referred Baptist to a psychiatrist for evaluation. R. 1785.

On February 23, 2016, Baptist saw Dr. Siddiqui.  After her discharge

from the 23-hour observation at the hospital, she did not have any episodes

of left-sided weakness.  She continued to have neck and back pain from

her automobile accident.  R. 1834.  On examination, Baptist had full range

of motion in her neck and in all of her joints; her recent and remote memory

were intact, and her concentration and attention span were normal; she

had 5/5 strength in her neck muscles as well as her upper and lower

extremities; she had intact muscle tone and no atrophy; her sensory

examination was normal.  R. 1835-36.  Dr. Siddiqui concluded,

> Patient is doing well after the procedure. No more episodes of
> transient left-sided weakness. I explained to the patient that the
> MRI findings are most likely secondary to the traction injury and
> are not strokes. That will heal with time. Patient can continue
> taking baby aspirin as long as it is okay with Dr. Amin.
> I will see her in year.
> Continue following Dr Amin. Please call me if needed.

R. 1836.

On March 10, 2016, Baptist saw psychiatrist Dr. Sankrant Reddy,

M.D.  She reported low energy and no motivation.  She had anxiety all the

time and did not sleep well due to pain.  On examination, Baptist was

oriented, alert, and in no acute distress; her mood was depressed, and her

affect was full; she had regular speech, normal psychomotor, linear thought

processes, intact associations, good insight and judgment, normal

concentration, and intact recent and remote memory.  She also had no psychosis or homicidal or suicidal ideations.  R. 1735-36.  Dr. Reddy assessed major depressive disorder and anxiety and prescribed bupropion (Wellbutrin).  R. 1736.

On June 10, 2016, Baptist saw Dr. Reddy.  She reported that her mood was better, but her depression was worse due to her medical problems.  On examination, she was oriented, alert, and in no acute distress; her mood was irritable but good, and her affect was full and calm; she had regular speech, normal psychomotor, linear thought processes, normal thought content, intact associations, good insight and judgment, normal concentration, and intact recent and remote memory.  She had no homicidal or suicidal ideations.  She also had normal gait and station.  R. 1731-32.  Dr. Reddy assessed major depressive disorder and anxiety and adjusted the dosage on the bupropion.  R. 1732.

On September 9, 2016, Baptist saw Dr. Reddy.  She was feeling depressed, sad, and having mood swings.  Her headaches affected her mood, her insomnia was fair, and her anxiety was stable.  Her energy was fair, and her appetite was okay.  R. 1728.  On examination, Baptist was oriented, alert, and in no acute distress; her affect was calm and sad; she had regular speech, normal psychomotor, linear thought processes, normal

thought content, intact associations, good insight and judgment, normal concentration, and intact recent and remote memory.  She had no homicidal or suicidal ideations.  She also had normal gait and station.  Dr. Reddy assessed major depressive disorder and anxiety and renewed her prescription.  Baptist was reluctant to increase the dosage.  R. 1728-29.

On March 13, 2017, Baptist saw Dr. Ellison.  She reported pain with her right hand.  She had problems holding two and a half pounds of water that day and carrying the water also affected her shoulders and neck.  R. 2074.  On examination, she was oriented and in no acute distress; her mood and affect were normal; she had pain to palpation of the right superior trapezius muscle and limited range of motion in her right shoulder; her bilateral grip was normal; her muscle strength and tone were normal. R. 2076.  Dr. Ellison increased the dosage of topiramate (Topamax) and stopped her gabapentin prescription, ordered an MRI of her cervical spine, and recommended exercise.  R. 2077.

On March 22, 2017, Dr. Samantha Dial, M.D. performed an EMG/nerve conduction study on Baptist due to complaints about wrist pain. The study showed mild right median neuropathy of the wrist.  Dr. Dial did not assess whether Baptist had cervical radiculopathy because Baptist would not allow any further needle exam.  R. 1823.

On March 30, 2017, Baptist had an MRI of her cervical spine which showed multilevel mild degenerative disc disease including superimposed small central protrusions with abutment of the ventral cord at C4-5 and C5-6 levels, and no high-grade circumferential stenosis at any level.  R. 2087.

On April 26, 2017, Baptist saw Dr. Ellison.  She had started taking Topamax six weeks earlier.  Her headaches were not any better and she reported pain in her right wrist and hand.  On examination, Baptist's mood and affect was normal; she was calm and happy; her gait and station were normal.  Dr. Ellison assessed headache and right wrist and hand pain.  He increased the dosage of Topamax.  R. 2025-28.

On November 27, 2017, nurse practitioner Wangard prepared a Medical Source Statement form.  R. 2056-60.  Wangard said Baptist's diagnoses were atypical anxiety, back pain, major depressive disorder, neck pain, and non-ruptured cerebral aneurysm.  She had symptoms of neck and back pain that may cause fatigue.  She had daily aching, throbbing, neck, head, and back pain, made worse by standing and carrying heavy objects.  The objective signs were minimal disc degeneration with no evidence of stenosis or cervical neural impingement.  Baptist's medication might cause nausea and fatigue.  Wangard did not opine on whether Baptist was a malingerer and said Baptist's depression

and anxiety affected her condition.  Wangard said that Baptist's impairments were consistent with her symptoms and functional limitations to which Wangard opined on the form.  Wangard opined that Baptist's pain would occasionally interfere with her concentration and attention and said she was capable of low stress work that was not physically demanding.  Wangard opined that Baptist could walk four to five blocks without rest or pain; sit at one time for more than two hours and stand at one time for two hours.  Wangard, however, opined that Baptist could stand/walk for less than two hours in an eight-hour workday and could sit for about four hours in an eight-hour workday.  Baptist had to get up and walk once an hour for ten minutes and needed a job that let her change positions at will.  She needed unscheduled breaks every one to two hours in an eight-hour workday, with each break lasting 10 to 15 minutes.  Wangard said that Baptist could frequently lift less than 10 pounds, occasionally lift 10 pounds, and rarely lift 20 pounds.  She could frequently hold her head steady, could occasionally turn her head up and down; and could both occasionally and frequently turn her head left and right.  Wangard opined that Baptist could occasionally twist, but she could never bend, crouch, squat, climb ladders, or climb stairs.  Wangard indicated that Baptist had no significant limitations reaching, handling, or fingering; however, she also stated that Baptist was

limited to reaching with either hand for 50 percent of an eight-hour workday.  Wangard opined that Baptist would miss work more than four days a month.  R. 256-59.  Wangard concluded:

> Patient's depression & anxiety certainly contribute to her perception of disability.  She had daily pain that [with] the depression is what leads her to believe she is disabled.

R. 2060.

On April 10, 2018, Baptist saw Dr. Ellison.  The record of this visit does not contain subjective reports from Baptist or notes of examination findings.  Dr. Ellison assessed chronic back pain, cervical radiculopathy, headache, neck pain, and paresthesia in both hands and restarted Baptist on gabapentin for pain.  R. 2200.

On May 8, 2018, Baptist saw Dr. Amin for cervical disc disease. Baptist reported continuing neck pain and muscle spasms since her automobile accident in December 2013.  Dr. Amin said a recent EMG study showed mild right C-7 radiculopathy and the recent imaging did not show any foraminal stenosis and was consistent with C-7 radiculopathy on the right side. Baptist denied having any gait or balance problems.  Dr. Amin recommended a referral to pain specialist Dr. Graham. R. 2089.

On examination, Dr. Amin observed that Baptist was alert and oriented.  She had 5/5 strength in her upper extremities and the Hoffman's

reflex test and Romberg test were negative.[4]  She had a normal tandem

gait.  She had pain on palpation over the posterior cervical musculature.

Dr. Amin concluded:

> Assessment plan: Our plan at this point will be to proceed with
> further conservative measures. We offered the patient
> consultation with Dr. Graham for her persistent whiplash type
> symptoms in the cervical region and reassured her that there
> was no severe foraminal stenosis or central stenosis in the
> cervical spine. We thank you very much allowing us to be
> involved the care of this pleasant patient.

R. 2091.

On July 17, 2018, Baptist saw pain specialist Dr. Louis Graham, M.D.

She reported continuing pain symptoms since her December 2013 motor

vehicle accident.  She had headaches, neck pain, and pain radiating down

her right arm into her hands and all activities made her pain worse.  Baptist

"subjectively feels weak in decreased sensation in the right upper

extremity."  Dr. Graham agreed with Dr. Amin's recommendation of

conservative treatment because she had minimal stenosis which was

consistent with her EMG report of mild C-7 radiculopathy.  R. 2063.  On

examination, Baptist had pain over bilateral greater and lesser occipital

nerve landmarks; she had positive facet loading in the neck and positive

---

[4] A Hoffman's reflex test is a test of reflexes at the fingertips.  A Romberg test is a test for balance when the person stands with feet close together and eyes closed.  See Dorland's, at 1712, 1715.

Spurling's maneuver, as well as multiple myalgias; she had 5/5 bilateral

upper and lower extremity strength.  Dr. Graham said that Baptist's MRI

showed minimal bilateral neural foraminal stenosis at C6-7, degenerative

disc disease, and no listhesis.  Dr. Graham assessed cervical

radiculopathy, bilateral occipital neuralgia, and myalgia and concluded:

> Medical Impression:
> 1. Right C7 radiculopathy: No red flag signs at this time. I do
> not see any overt weakness. She does have positive EMG
> findings for acute radiculopathy but minimal disc protrusion to
> correlate with this. Evaluated by neurosurgery and conservative
> treatment recommended at this time. Agree with this.
> 2. Bilateral greater and lesser occipital neuralgia
> 3. Myalgias associated with chronic neck pain

R. 2065-66.  Dr. Graham offered nerve blocks for the occipital nerves,

trigger point injections for myalgias in Baptist's neck, and right C7

transforaminal epidural steroid injections for her radiculopathy.  Baptist said

she would think about it.  R. 2065.  She did not elect to proceed with any of

these treatments.

<u>The Evidentiary Hearing</u>

The Administrative Law Judge (ALJ) held an evidentiary hearing on

February 12, 2019.  Baptist appeared pro se.  Vocational expert David

Saluski also appeared.  R. 65.

Baptist testified first and stated she was divorced.  She completed

high school and had four children ages 37, 35, 27, and 18.  The oldest,

Page **28** of **45**

Kevin, was disabled.  Kevin and the youngest child lived with her.  She

testified that she was paid by the State of Illinois to care for Kevin.  She

gave her son, Kevin, verbal prompts for his everyday living skills.  Kevin

worked through SPARC, an agency that assist developmentally disabled

individuals. [5]  A special bus called the Springfield Access Bus took Kevin to

and from his work.  Baptist had a driver's license and a car and drove three

to four times a week taking short trips to the store or the doctor's office.  R.

73-75,78-80.

Baptist testified that she could not work because of her pain.  She

had chronic pain in her back and neck and migraine headaches that

caused her to lay in bed in a fetal position crying.  She was on five different

pain medications, had disc protrusions, and was in pain every day since

her automobile accident.  R. 82.  She also had "a deep weighing of a

sensation, burning sensation in my shoulders that they feel like they're

weighed down."  She had burning pain when she lifted her arms and also

was tired all the time.  R. 85.

She said that Dr. Ellison did not want her to get steroid injections.  He

prescribed duloxetine (Cymbalta) instead.  Baptist did not receive spinal

---

[5] The transcript contains the spelling of Spark for the name of the agency.  The Court takes judicial notice that the correct spelling is SPARC.  See www.spfidsparc.org, visited December 8, 2021.

injections at all and she tried physical therapy twice.  No doctor recommended surgery on her spine or neck, a spinal cord stimulator, or a pain pump.  R. 84-85.  She took Topamax for her migraines, but still had headaches with the medication.  Dr. Ellison wanted to increase the dosage of her medications, but she did not want to because of side effects, "He wants to increase them, but I can't lay on my bed like a zombie. I cannot just lay there like a zombie. I have to be there for my son, my family, right? bed sleeping all day.  I mean, I can't lay in my bed sleeping all day."  R. 86.

Baptist testified that she could walk a block with difficulty.  She could not stand for 10 minutes due to pain in her lower back.  She could sit for 10 to 15 minutes before she had to change positions.  She could lift a gallon of milk with both hands.  R. 87-88.

Baptist spent much of her day lying down and he son Kevin did the dishes, laundry, and cooking.  She went downstairs with Kevin to the basement to direct while he did the laundry.  She also watched and directed Kevin while he cooked.  Her youngest son (and sometimes Kevin) mowed the yard.  Baptist paid the bills and she and Kevin went grocery shopping together.  Baptist watched television during the day.  She also had pet cats.  R. 88-91.

Vocational expert Saluski then testified.  The ALJ asked Saluski the following hypothetical question:

> Q Okay. For the first hypothetical, I'd like you to assume a hypothetical individual of the Claimant's age, education, and with the past jobs we just discussed. Further assume this individual can perform work at the medium exertional level. In addition, can stand, sit, and/or walk for six hours out of an eight-hour workday. Could such a hypothetical individual perform any of the Claimant's past work?

R. 94.  Saluski opined that the person could perform Baptist's past relevant work as a personal assistant, store clerk, and banquet bartender.  Saluski opined that the person could perform all these jobs if she was further limited to light exertional work.  R. 95.  The person could perform the personal assistant job as Baptist actually performed it but not as described in the Department of Labor's Dictionary of Occupational Titles.  R. 95.

Saluski said that the person could not work if she was off task more than 15 percent of the time at work, missed work more than one day a month, or needed to take additional unscheduled breaks at work.  R. 97.  The hearing concluded.

## THE DECISION OF THE ALJ

The ALJ issued her decision on May 8, 2019.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the

claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that she is disabled regardless of her age, education, and work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work considering her age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden at Step 5 to present evidence that, considering the listed factors, the claimant can perform some type of

gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Baptist met her burden at Steps 1 and 2.  She had not engaged in substantial gainful activity since the Onset Date, except for the period from January through September 2015, and she suffered from the severe impairment of cervical radiculopathy.  The ALJ found that Baptist's aneurysms did not cause any function limitations on her ability to work.  The ALJ relied on Dr. Kale's examination in which he told her to stop smoking and limited her to lifting 20 pounds.  She relied on the fact that after the surgery she was told she could resume her activities in six weeks. The ALJ also noted that Baptist went to the emergency room after the operation on her aneurysms but relied on Dr. Siddiqui's finding that she did not have a stroke at the time.  R. 27-28.

At Step 3, the ALJ found that Baptist did not meet a Listing.  The ALJ considered the Former Listing 1.04 for disorders of the spine.[6]   The ALJ found that Baptist did not meet this Listing because she could ambulate

---

[6] The Listings for spine and musculoskeletal impairments were revised effective April 2, 2021.  85 Fed. Reg. 78164 (December 3, 2020).  The revised Listings do not apply because the Commissioner decided this case before that date.  Id. n.2.

and because she did not have spinal arachnoiditis or muscle atrophy. R.
28.

> The ALJ then concluded that Baptist had the following RFC:

> 5. After careful consideration of the entire record, the
> undersigned finds that the claimant has the residual functional
> capacity to perform the full range of light work as defined in 20
> CFR 404.1567(b) and 416.967(b) and she is able to sit, stand,
> and walk for 6 hours each in an eight-hour period.

R. 28. The ALJ relied on the following: the EMG and MRI studies, as well
as the interpretation of those studies by Drs. Ellison and Amin that they
showed only mild impairments; Baptist's refusal to undergo treatment in the
form of injections and pain blocks proposed by Drs. Narla and Graham;
Baptist continued to work throughout this period as a paid personal
assistant for her son Kevin; and several medical examinations showed
normal muscle tone, normal grip strength, normal or near normal muscle
strength, and normal range of motion in all extremities. The ALJ also relied
on the opinions of Drs. Oh and Williams and the 20-pound lifting limitation
imposed by Dr. Kale. R. 28-33.

The ALJ did not give weight to Baptist's statements about the limiting
nature of her pain and other symptoms. The ALJ relied on the fact that she
did not undergo recommended treatment, and she described a level of
activity in her Function Report that she was not as limited as she alleged.

The ALJ also relied on the fact that Dr. Ranatunga observed that Baptist inconsistently could not make a fist in grip strength testing, but then made a fist in range of motion testing; Dr. Ellison stated in March 2015 that nothing in her examination supported her claims of pain and tingling; Dr. Ellison stated in October 2015 that she did not try in her strength testing, she was exaggerating her condition, he did not know if she was malingering, and there was no objective evidence showed that supported her symptoms; and Dr. Amin stated in May 2018 that the more recent EMG and MRI studies showed only mild degenerative changes without significant foraminal or spinal stenosis and that Baptist denied any balance or gait issues.

The ALJ also gave little weight to the written opinions of Dr. Ellison and nurse practitioner Wangard. The ALJ found that the opinions were not consistent with the other medical evidence in the record; were not consistent with the fact that she worked the entire time as a personal assistant to her son and that she worked at the level of substantial gainful activity from January through September 2015. The ALJ also noted that Dr. Ellison stated that his opinions were based on Baptist's subjective reports because the objective medical evidence did not show the claimed level of limitation. R. 33-34.

The ALJ concluded at Step 4 that Baptist could perform her prior relevant work.  The ALJ relied on the RFC and the opinions of vocational expert Saluski.  R. 34-35.  The ALJ concluded that Baptist was not disabled.  R. 35.

Baptist appealed the decision of the ALJ administratively.  On April 24, 2020, the Appeals Council denied Baptist's request for review.  The decision of the ALJ then became the final decision of the Defendant Acting Commissioner.  R. 1.  Baptist then filed this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must accept the findings if they are supported by substantial evidence and may not substitute its judgment or reweigh the evidence.  Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351,

367 (7th Cir. 2014); <u>Elder v. Astrue</u>, 529 F.3d 408, 413-14 (7th Cir. 2008);

SSR 16-3p, 2017 WL 5180304, at *1 (October 25, 2017) (The Social

Security Administration no longer uses the term credibility in the evaluation

of statements regarding symptoms).  The ALJ must articulate at least

minimally her analysis of all relevant evidence.  <u>Herron v. Shalala</u>, 19 F.3d

329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical

bridge from the evidence to her conclusion."  <u>Clifford v. Apfel</u>, 227 F.3d

863, 872 (7th Cir. 2000).

        The decision of the ALJ was supported by substantial evidence.  The

RFC was supported by the EMG and MRI studies that showed mild

degenerative disk disease, not spinal or foraminal root compression, and

mild C-7 radiculopathy; the examination notes that showed normal strength

and normal range of motion;  Dr. Ellison's statements that Baptist's

complaints were not supported by any medical evidence, that she was

exaggerating during her examination, and that he could not tell if she was a

malingerer; Dr. Amin's 2018 evaluation of the EMG nerve conduction

studies and MRIs and his conclusion that she had only showed mild

degenerative changes and no significant stenosis; Dr. Graham's

concurrence with Dr. Amin's assessment; Dr. Kale's 20 pound lifting

limitation; and the opinions of Drs. Oh and Williams.

The ALJ also relied on substantial evidence to give little weight to Baptist's statements about the effect of her pain.  Drs. Ellison and Ranatunga noted inconsistencies in her effort during examinations. Baptist's primary care physician Dr. Ellison stated that he did not know if she was malingering, the medical evidence did not support her claimed symptoms, and she exaggerated during examinations.  When the medical evidence and the other evidence in the file does not support a claimant's statements, the ALJ may give little weight to the claimant's statements of the effects of her symptoms:

> [I]f an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities….

SSR 16-3p, 2017 WL 5180304 at *8.

The ALJ's decision to give little weight to the opinions of Dr. Ellison and nurse practitioner Wangard was also supported by substantial evidence.  The ALJ must give the opinions of a treating physician controlling weight if the opinions are supported by objective evidence and are not inconsistent with other evidence in the record.  20 C.F.R. §

404.1527(d)(2); <u>Bauer v. Astrue</u>, 532 F.3d 606, 608 (7th Cir. 2008).[7]  The
ALJ found that Dr. Ellison and nurse practitioner Wangard's opinions were
inconsistent with the objective medical evidence and other evidence in the
medical record.  The ALJ explained that the opinions were inconsistent with
evidence that: Baptist worked at the level of substantial gainful activity from
January 2015 through September 2015; she had no muscle atrophy; she
had no spinal surgeries; she refused treatment such as the treatments
offered by Dr. Graham in 2018; she refused to let Dr. Dial complete her
EMG study to test for cervical radiculopathy; the MRIs that showed no
spinal stenosis or cord compression; Baptist showed inconsistent effort in
her examinations with Dr. Ranatunga and Dr. Ellison; medical examinations
showed she could engage in fine manipulations; and numerous medical
examinations found that she had normal or near normal strength, reflexes,
and grip strength; and numerous examinations showed normal
concentration, mood, affect, insight, judgment, attention span, and intact
memory.  R. 30, 34.  The ALJ also noted that Dr. Ellison said that his
opinions were not consistent with the medical evidence, that he did not

---

[7] The Commissioner amended the regulations regarding the interpretations of medical evidence.  The
amendments, however, apply prospectively to claims filed on or after the amendment's effective date of
March 27, 2017. <u>Revisions to Rule Regarding the Evaluation of Medical Evidence</u>, 82 Fed. Reg. 5844-01,
at 5844-45 (January 18, 2017).  As such, the amendments do not apply here.

know if Baptist was malingering, and that his opinions were only based on Baptist's subjective statements. The ALJ also noted nurse practitioner Wangard opined that Baptist had limited concentration and attention, and Dr. Ellison said she may be limited cognitively. R. 31. The ALJ found that these two opinions were inconsistent with numerous examinations that found normal concentration, mood, affect, insight, judgment, attention span, coherent speech, and intact memory. R. 30-31. The ALJ also found these opinions inconsistent with Dr. Ellison's opinion that Baptist could perform high stress work. The ALJ cited substantial evidence to support her conclusion that the opinions of Dr. Ellison and nurse practitioner Wangard were not consistent with other medical evidence in the record.

Baptist argues that the ALJ erred in giving great weight to the opinions of Drs. Oh and Williams. Baptist argues that the opinions of these doctors were old and stale and did not reflect the more recent medical evidence, particularly the more recent EMG nerve conduction study and MRI. The Court disagrees. The ALJ found that the opinions of Drs. Oh and Williams were consistent with medical evidence. That included the subsequent evidence such as the EMG nerve conduction study and MRI. The older EMG study found C-7 radiculopathy. Dr. Dial was unable to test for cervical radiculopathy because Baptist would not cooperate. The 2017

MRI showed mild degenerative disc disease, which included small central protrusions with abutment of the ventral cord at C4-5 and C5-6, and no high-grade circumferential stenosis.  Dr. Amin reassured Baptist that the MRI showed no severe foraminal stenosis or central stenosis in the cervical spine.  Dr. Graham concurred Baptist's EMG and MRI studies showed mild cervical radiculopathy and mild degenerative disease.  These later medical findings provide substantial evidence to support the ALJ's finding that the opinions of Drs. Oh and Williams were consistent with all the evidence in the record.

Baptist argues that the ALJ was not qualified to interpret the EMG and MRI studies and improperly played doctor when she interpreted the studies.  The Court disagrees.  The ALJ cited Dr. Amin's 2018 interpretation of the EMGs and MRIs.  Dr. Amin concurred in 2018 that Baptist's MRIs showed only mild degenerative changes and no significant foraminal or spinal stenosis.  Dr. Graham concurred with Dr. Amin that there were "no red flags" in the EMG and MRI studies.  The ALJ did not play doctor.  These findings from Dr. Amin and Graham in 2018 provided substantial evidence to support the ALJ's finding that the opinions of Drs. Oh and Williams were consistent with the other medical evidence in the record.  There was no error.

Baptist relies on the case of Goins v. Colvin, 764 F.3d 677, 680 (7th Cir. 2014). The Seventh Circuit reversed the ALJ's decision in Goins because the ALJ relied on RFC assessments that were stale and did not consider all the medical evidence. Id. The Goins case does not apply here because the ALJ considered all the medical evidence, including the more recent EMG and MRI studies. The ALJ here considered the statement from Baptist's primary care physician that there was no medical reason for the claimant's condition; the more recent medical examination notes from Drs. Amin and Graham in 2018 that Baptist's EMG and MRI studies only showed mild radiculopathy and mild disc disease that only required conservative treatment; and the fact that Baptist declined to undergo the recommended treatment offered by Dr. Graham. The ALJ in the Goins case did not rely on such subsequent evidence, but only the older opinions. The Goins case, therefore, does not apply.

Baptist argues that the ALJ did not give good reasons for giving little weight to the opinions of Dr. Ellison and nurse practitioner Wangard. The Court again disagrees. As explained above, the ALJ gave good reasons for her evaluation of these opinions.

Baptist argues that the ALJ erred in not considering her aneurysms to be severe impairments. The Court again disagrees. The records

contained substantial evidence to support the ALJ's finding that the aneurysms did not cause permanent functional limitations. Dr. Kale said that Baptist's headaches were not related to the aneurysms. The surgical discharge instructions stated that she could resume all activities without restrictions after six weeks. Her post-surgical episode of left-sided weakness in February 2016 was temporary, and Dr. Siddiqui found that she did not have a stroke after the surgery and that her symptoms would subside. The record amply supported the conclusion that the aneurysms did not have more than a minimal effect on her ability to perform work activities. See 20 C.F.R. § 404.1522(a); SSR 85-28, 1985 WL 56856 at *3. The ALJ did not err.

Baptist argues that MRIs showed that Baptist's condition was "threshold with regard to Listing 1.04(a): spinal cord compromise as demonstrated by disc protrusions abutting the cord at three levels." Plaintiff's Memorandum in Support of Summary Judgment (d/e 16), at 17. The Court is not sure what Baptist means by the term "threshold" or the legal significance of being "threshold." Ample evidence, however, supports the ALJ's conclusion that Baptist's condition did not meet the requirements of Former Listing 1.04. Former Listing 1.04(A) required compromise of a root nerve or the spinal cord with:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

Former Listing 1.04.  The imaging studies and other medical evidence did not show nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis.  Further, Baptist's medical records showed that she had no difficulty ambulating.  The medical evidence supported the ALJ's conclusion that Baptist did not meet this Listing.  There was no error.

THEREFORE, THIS COURT RECOMMENDS that Defendant Commissioner's Motion for Summary Affirmance (d/e 19) should be ALLOWED, Plaintiff Michelle Baptist's Motion for Summary Judgment

(d/e 15) should be DENIED, and the decision of the Acting Commissioner should be AFFIRMED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). Failure to file a timely objection will constitute a waiver of objections on appeal. See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986). See Local Rule 72.2.

ENTER:   January 18, 2022

_____s/ Tom Schanzle-Haskins_____
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE